(C. D. 883)

OLDETYME DISTILLERS, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided October 21, 1944)

*Benjamin A. Levett* (*Meyer Ohlbaum* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*William J. Vitale* and *Joseph F. Donohue*, special attorneys), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

KEEFE, Judge: In this case the plaintiff alleges that duty was taken upon the basis of too great a quantity of whisky contained in 60 barrels.

At the trial counsel for both sides stipulated and agreed to the facts as follows:

1. That the plaintiff herein purchased 60 barrels of scotch malt whisky out of WHB 42306, S. S. *Which-One* entered at the port of New York on December 26, 1933.

2. That thereafter and on or about November 14, 1936, said plaintiff exported from bonded warehouse said 60 barrels under export entry No. 3407, S. S. *Cameronia*, for shipment to Scotland.

3. That prior to said exportation the collector of customs caused said 60 barrels of whisky to be regauged and said regauge showed the actual quantity of spirits

in said barrels to be 790.25 net proof gallons. That all of said barrels were in good condition except barrel No. 24.

4. That upon arrival of the vessel in Scotland, the said 60 barrels were refused admission to that country and were held by the customs official in his official custody.

5. That on or about the 20th day of December 1936 the said 60 barrels were laden aboard the S. S. *Transylvania* for reshipment to New York.

6. That upon arrival of said vessel at New York, a duty paid entry was made covering the said 60 barrels, entry No. 837722, and the quantity of spirits was stated in the entry as 763.8 proof gallons.

7. That said 60 barrels of spirits were again gauged by the United States gauger who found the actual quantity of spirits in said barrels to be 756 proof gallons.

8. That upon liquidation of said duty paid entry, the collector of customs assessed internal revenue tax upon the actual quantity imported as shown by the United States gauger, namely, 756 proof gallons; that for the assessment of the regular customs duties the collector took the capacity of the barrels as shown by the gauger's report less 2½% for outage and assessed duty on that number of gallons, namely, 962.01 proof gallons.

An examination of the entry papers discloses that when the whisky was originally entered for warehouse in 1933 the official gauge thereof was 967.94 proof gallons. Upon withdrawal for export 3 years later the customs gauger reported 790.25 proof gallons. After entrance into the United Kingdom was refused, the English customs authorities held the merchandise in custody from November 24, 1936, the day of arrival, to December 11, 1936, when it was returned to the United States upon the S. S. *Transylvania.* Upon arrival at New York on December 28, 1936, the merchandise was again gauged by the customs gauger and 756 proof gallons of whisky were reported as the total contents of the 60 kegs, being 7.8 proof gallons less than the entered quantity. In determining the quantity upon which duty was assessable, the collector disregarded the entered and regauged quantity and calculated the duty upon the basis of 962.01 proof gallons, figured from the capacity of the kegs, 810 gallons, less 2½ per centum for outage on the basis of the proof reported by the gauger.

The plaintiff contends that duty should have been assessed only upon the actual quantity of whisky arriving in this country and that an assessment upon a greater quantity was illegal; and that the quantity shipped from the foreign port was the quantity landed in this country as shown by the customs gauger's return. It is further contended that inasmuch as no loss in quantity is claimed the provisions of paragraph 813 of the Tariff Act of 1930 are inapplicable, and likewise the customs regulations promulgated in conformity with paragraph 813 are inapplicable, first, because the provisions of paragraph 813 are not invoked, no claim being made for an allowance for breakage, leakage, or damage by reason of a cask or package being broken or otherwise injured in transit from a foreign port which resulted in the loss of part of the contents as exported, and second, because under the circumstances there necessarily could not

have been an invoice and consequently the importer was unable to specify in an invoice the quantity of spirits in each of the 60 kegs as provided in article 817 (e) of the Customs Regulations of 1931. Because of the impossibility of providing an invoice for the shipment, it is argued that the principle announced in our appellate court's decision in *Park & Tilford* v. *United States*, 9 Ct. Cust. Appls. 53, T. D. 37906, is not applicable.

The Government contends that the collector was justified in assessing duty on 962.01 proof gallons of whisky in view of the regulations which were held to be reasonable and legal in the *Park & Tilford* case, *supra*. It is further contended that all the evidence before the court was before the collector when he assessed duty on the basis of the capacity less normal outage, and his action, not having been overcome by the production of affirmative evidence, is presumptively correct.

Paragraph 813 of the Tariff Act of 1930 provides as follows:

PAR. 813. There shall be no constructive or other allowance for breakage, leakage, or damage on wines, liquors, cordials, or distilled spirits, except that when it shall appear to the collector of customs from the gauger's return, verified by an affidavit by the importer to be filed within five days after the delivery of the merchandise, that a cask or package has been broken or otherwise injured in transit from a foreign port and as a result thereof a part of its contents, amounting to 10 per centum or more of the total value of the contents of the said cask or package in its condition as exported, has been lost, allowance therefor may be made in the liquidation of the duties.

Article 817 of the Customs Regulations of 1931 was enacted in pursuance of paragraph 813. Subparagraphs (a) and (b) thereof define the phrase "delivery of the merchandise." Subparagraph (c) instructs the customs officials in the application of the term "broken or otherwise injured." Subparagraph (d) defines the phrase "contents in condition as exported" as meaning—

the invoiced quantities, provided specifications are given for each individual package, otherwise the "contents exported" shall be held to be the gross capacities returned by the gauger.

And then in subparagraph (e) it is provided that all other outages will be subject to an allowance of 2½ per centum for normal outage from the capacity as shown by the gauger's return or the invoice quantity, according to the circumstances, the subparagraph reading as follows:

(e) *Outages not within the scope of the preceding subdivisions of this article by reason of* being under 10 percent or *not being the kind of loss provided in the law,* or by failure to file timely affidavit, *will be subject to an allowance of 2½ percent for normal outage from the capacity as shown by the gauger's return or the invoice quantity, according to the circumstances.* [Italics not quoted.]

Paragraph 813, *supra*, in our opinion, was intended to prohibit allowances from the exported quantities of liquor, etc. Exceptions to such prohibition were made solely for losses occurring during transportation to this country from a foreign port, through breakage,

leakage, or damage to a cask or package, when such injury in transit resulted in the loss of 10 per centum or more of the value of the contents. In other words, any losses in the exported quantities of liquors are not to be considered in the assessment of duties, except as provided in paragraph 813, *supra*. When a loss occurs to such extent, Congress provided for the manner and procedure to be followed by the collector in granting an allowance in duties for such loss, and authority was granted in paragraph 815 to the Secretary of the Treasury to prescribe rules and regulations necessary for the enforcement of the provisions of paragraph 813. Consequently compliance with the regulations is a condition precedent to an allowance in duties in cases where there is such a loss as provided for in paragraph 813, *supra*. However, the importer is not precluded from establishing in open court the actual exported quantity and thus showing that there has not been such loss as would bring the importation within the mandatory regulations of the Secretary of the Treasury.

Subparagraphs (*a*), (*b*), (*c*), and (*d*) of article 817 were made pursuant to the provisions of paragraph 815. Subparagraph (*e*) of article 817, however, in providing that "Outages * * * not being the kind of loss provided in the law * * * will be subject to an allowance of 2½ per centum for normal outage from the capacity as shown by the gauger's return * * *" implies that the imported quantities are less than the exported quantities, and that there has been a reduction in quantity in manner otherwise than by leakage, breakage, or damage. If an importer is precluded by reason of such regulation from establishing before a court of competent jurisdiction the quantity that was actually exported, and thus deprived of any redress in circumstances where the exported quantity was known to be less than the keg capacity, such regulation would amount to nothing more than legislation by an administrative department of Government, as it would penalize importers for importing liquors in partly filled casks. Clearly there is nothing in paragraph 813 which limits the importation of bulk liquors to such as are in filled kegs, or anything to prevent an importer from establishing that the vacuity reported by the Government gauger was not caused through leakage, breakage, or damage on the voyage of importation.

These regulations governing the amount of duty assessable upon liquors have been promulgated in substantially the same language in various issues of customs regulations and have been in operation for many years. Several tariff acts have been passed without comment by Congress upon the assumption if any, of legislative power by the Secretary of the Treasury. Furthermore, this very question was considered by our appellate court in the case of *Park & Tilford, supra*, where the court commenting upon these regulations stated that they were first promulgated under the Tariff Act of 1897 and similar rules

were issued under the Tariff Act of 1913. It might be noted here that paragraph 296 of the Tariff Act of 1897, under which the regulations were first promulgated contained no exceptions. It reads as follows:

*And provided further,* That there shall be no constructive or other allowance for breakage, leakage, or damage on wines, liquors, cordials, or distilled spirits. * * *.

In the foregoing case, our appellate court stated in its decision as follows:

As appears from the foregoing regulations the department adopted the view that Congress, in enacting paragraph 244 [Act of 1913] intended to prohibit all actual or constructive allowance for outage or wantage in importations like the present, except only where a cask or other package has been broken or otherwise injured while in transit, in which case an allowance for the loss shall be made when the facts appear according to certain prescribed requirements.

It is manifest from a reading of the foregoing extracts [T. D. 26547 and T. D. 27379 Treasury regulations] that the action of the collector in this case was authorized and required by the Treasury regulations above quoted. [Articles 612, 613, and 614, Customs Regulations of 1915.] These regulations explicitly require that in the absence of such leakage as may be allowed for under the proviso to paragraph 244, supra, *the collector shall base the assessment upon the invoice quantity, less 2½ per cent normal outage, where that is greater than the actual quantity found by the gauger,* and that in cases *where the invoice quantity is less than that found by the gauger,* or *where the invoice fails to declare the quantity, the invoice shall be disregarded and the assessment based upon the capacity of the casks reported by the gauger, less 2½ per cent for normal outage.*

The importers, however, contend that these regulations of the Treasury Department are unreasonable, illegal, and unconstitutional, since they have the result of assessing duty upon merchandise in excess of that actually imported into this country.

We do not think, however, that these contentions can be sustained. It is prescribed by the tariff act (par. C., sec. 3), administrative provisions, that all invoices of imported merchandise "shall contain a correct, complete, and detailed description of such merchandise and of the packages, wrappings, or other coverings containing it." It is certainly no forced application of this provision to require an importer of liquor in casks to declare in the invoice the correct quantity in each cask at exportation. In fact, it is difficult to see how the provisions of paragraph 244, supra, can be enforced or applied without such a declaration of quantity in the invoice. If an importer of liquor fails to make such a declaration in his invoice, or makes an incorrect one therein, he can have no right to complain if the reported capacity of the containers be accepted by the collector as the quantity in them at the time of exportation. It is equally clear that the importers in this case can not claim exemption from the duty of correctly declaring in the invoice the quantity shipped in the casks, because of the inconvenience of gauging their casks before shipment, or the danger of blending which would result from that operation. The fact that the procedure prescribed by the foregoing regulations may result in assessing duty upon a larger quantity of liquor than is found in the casks at importation does not condemn the rule as unconstitutional. It may be observed that in paragraph 244, supra, Congress has provided that liquors imported in bottles shall be packed in packages containing not less than 1 dozen bottles in each package, or duty shall be paid as if such package contained at least one dozen bottles. This provision has been sustained by the courts, although it results in given cases in assessing importations of liquor at a greater

quantity than actually imported. See Aurola *v.* United States (2 Ct. Cust. Appls. 340; T. D. 32077) and authorities therein cited. *In fact, paragraph 244, supra, is founded upon the view that where importations of liquor arrive in this country duty may be assessed upon them at a larger quantity than that actually imported, in cases wherein the regulations governing such importations have not been obeyed.*

According to the Treasury regulations, therefore, the collector was justified in finding that at the time of shipment the casks in question respectively contained a greater quantity of liquor than at the time of their arrival in this country, and that the shortage had not occurred from such causes as should be allowed for in view of the prohibitions of paragraph 244, supra.

*Nor do we regard the Treasury regulations above cited when applied to outages accruing during transit as acts of legislation and therefore beyond the powers possessed by an administrative department of the Government.* The rules prescribed therein appertain to practical methods of collecting the duties which Congress has imposed, and do not themselves tend to impose other duties. Furthermore, it may be noted that the Treasury rules in question were promulgated and enforced prior to the revisions of the tariff laws of 1909 and 1913, respectively, and that no change was made in the administrative provisions of either revision in reference thereto. [Italics not quoted.]

In the foregoing case, in assessing duty upon the liquors, where the invoice quantity exceeded the quantity found in the casks by the gauger, the collector adopted the invoice quantity as the basis of assessment, less 2½ per centum for normal outage. Where the gauger found more liquor in the casks than the invoice called for, the collector ignored the invoice statement and assessed duty upon the capacity of each cask as found by the gauger, less 2½ per centum for outage. Where the invoice contained no declaration as to the quantity contained in the casks, the collector also adopted the capacity of the casks reported by the gauger and deducted 2½ per centum normal outage. By this procedure in each of the three classes noted above, duty was assessed upon a greater quantity of liquor than was found by the gauger to have been contained in the casks upon their arrival in this country. There also, *"the importers distinctly disclaimed any intention of founding their protest upon the allowance for breakage provided for by the foregoing provision. There was indeed no report of the gauger that any of these casks had been broken in transit, but to the contrary they appear to have been received in good condition."* There was not only an absence of evidence of leakage from any of the casks during transit, but there was no satisfactory proof in the record of any loss before exportation. However, that case, as the case here before us, was submitted upon the record evidence before the collector and no attempt was made by the importers to establish the actual exported quantity.

Also in that case the court disregarded the change in language in the Tariff Act of 1913 from that of the Tariff Act of 1897. In the latter act, as well as in the Tariff Act of 1909, the provision read: "That there shall be no constructive or other allowance for breakage, leakage, or damage * * *." In the Tariff Act of 1913 Congress

expressed itself in substantially the language of paragraph 813, *supra*. However, our appellate court stated in no uncertain terms that it did not regard the Treasury regulations "when applied to outages accruing during transit" as acts of legislation and beyond the powers possessed by an administrative department and then held such regulations applicable to importations of liquor where there was no loss in quantity from any of the casks while in transit or no proof of loss before exportation. In view of the failure of the importer to establish the actual quantity exported the court, in effect, held that the collector could, under the law, legally base his assessment of duty upon the capacity of the casks, even though admittedly there were no outages during transit.

The importer in the case before us here stresses the fact that it was impossible to provide an invoice for the imported liquors and consequently the importation was not in the ordinary course of business, and an exception should be made in this instance, particularly because of the fact that the customs authorities were perfectly aware at the time of exportation from the United States of the quantities of liquor contained in the 60 kegs because each keg was gauged before being released for export, and that the re-imported quantities were only 34.25 gallons less than the quantities exported, a loss of less than 5 per centum.

These regulations have been approved by a higher tribunal as legally adopted and legally administered when applied to importations of liquors where there is no apparent loss from breakage, leakage, or damage or from any other source. True, in all cases brought to our attention there has not been any affirmative proof as to the actual quantity shipped. Such a situation might present a different question. As we view it, the situation before us is on all fours with the decision of the appellate court in the *Park & Tilford* case. The absence of an invoice could not act to place an importer in a better position than he would be if he had supplied an invoice without noting thereon the exported quantities. Since that case was decided two tariff acts have been passed by Congress and paragraph 244, of the Tariff Act of 1913, has been reenacted without change. Congress is presumed to be cognizant of that decision and in reenacting the law without change it has ratified the interpretation of the courts and has made the customs regulations here complained about as much a part of the law as though they had appeared therein respecting the particular situations arising in that case.

In this case there was no evidence of any kind before the collector as to the quantity of liquor in these casks or kegs except that found by the United States Government gauger. Therefore, under the regulations, it was the duty of the collector to adopt for duty purposes the

capacity of the kegs or casks as reported by the customs gauger less the outage of 2½ per centum.

This liquor had been in bonded warehouse. Had it entered into consumption without either being exported or reimported, there is no doubt that it would be the duty of the collector to levy duty upon the original gauge, to wit, 967.94 proof gallons, which is 5.93 proof gallons more than the capacity of the barrels, less 2½ per centum, the quantity used by the collector in his assessment of duty. In any event, there was no proof whatever before the collector, nor is there any before this court, of the amount of liquor in the casks at the time of exportation, not even an invoice, which in the case of *Seagram* v. *United States*, 30 C. C. P. A. 150, C. A. D. 227, was held to be some evidence of the quantity. There the collector assessed duty in accordance with article 815, *supra*, "because the gaugers' returns showed larger quantities than those shown in the invoices." The court found that the importer had established that the customs gaugers had improperly determined the quantity of liquor in the casks and their action was void. Consequently the invoiced quantities were held to be evidence of the quantity of liquor to be adopted by the collector upon which duty should have been assessed.

Although we are of the opinion that ruling against the importer in this case is a hardship, we are without equity jurisdiction and are constrained so to do. The importer will have to look to Congress for relief because, clearly, the judiciary can give none.

For the reasons stated, judgment will be rendered in favor of the Government.